Filed 10/4/21  In re M.T. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re M.T., a Person Coming Under the Juvenile Court Law. | B309536 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 20CCJP05668A |
| Plaintiff and Respondent, | |
| v. | |
| R.T., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Marguerite D. Downing, Judge.  Affirmed in part, dismissed in part.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Timothy M. O'Crowley, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————

Mother appeals from the juvenile court's jurisdictional and dispositional order declaring her now-12-year-old son M.T. a dependent under section 300 of the Welfare and Institutions Code[1] and removing him from her custody. We affirm, finding substantial evidence supports the court's jurisdictional findings. Because M.T. has been returned to mother's care, her challenge to the dispositional order is dismissed as moot.

## FACTS AND PROCEDURAL BACKGROUND

Consistent with our standard of review, we state the facts in the light most favorable to the juvenile court's findings, resolving all conflicts and drawing all reasonable inferences to uphold the court's order, if possible. (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

### 1.	*Incident leading to section 300 petition and detention*

The family consists of mother and M.T. (born January 2009). M.T.'s father was not involved in his life; his whereabouts were unknown.

The Department filed the petition after receiving a call to its hotline from M.T.'s neighbor on September 13, 2020, alleging mother had kicked M.T. out of the house. The caller said M.T. reported he woke to mother yelling at him for leaving some tools uncovered; mother packed a bag with his things and her girlfriend threw it outside. The neighbor received a text from mother looking for M.T., but M.T. asked the neighbor not to reply. According to the neighbor, M.T. said mother had hit him in the past and left bruises. M.T. also told the neighbor

---

[1]	Statutory references are to the Welfare and Institutions Code.

2

mother had hit him "a couple [of] days ago" for "not holding something correctly." M.T. had no visible bruises. The Department confirmed with law enforcement that mother had reported M.T. had run away, but returned one and one-half hours later.

A Department social worker interviewed mother at her home a few days later. The home was clean, stocked with sufficient food, and presented no safety concerns. Mother displayed no indication of substance abuse. Mother told the social worker that the night before M.T. left, she and her partner E.N. had asked M.T. to take out the trash, but he didn't. In the morning, E.N. again asked him to take the trash out and took away his phone. M.T. packed a bag, so E.N. locked the front door and told him to go to his room. M.T. grabbed his bag and snuck out of the house. Mother said she called M.T.'s contacts on his phone, called the police, and looked for him in the neighborhood with the entire family. Mother denied telling M.T. to leave.

Mother also denied physical abuse. When M.T. misbehaves, mother said she takes away his phone or other electronics. Mother admitted to hitting M.T. twice with a belt on "the butt": once when he stole $500 and the year before when he stole a cell phone.[2] M.T. also had told the neighbor mother hit him with a broom. Mother denied that accusation and denied having hit him for not holding something properly. Mother said

---

[2] As we discuss, in follow-up interviews M.T. and mother said M.T. was between seven and nine years old when mother hit him for taking a cell phone, and mother said that was the only time she hit him with a belt. M.T. said mother hit him for taking money when he was six years old, not the year before.

M.T. had begun to misbehave right before the shutdown from the COVID-19 pandemic; his behavior worsened during the resulting quarantine. Mother told the social worker she would like for M.T. to participate in therapy.

Mother revealed the family had a history with the Department. M.T. has severe eczema and would scream when water touched his skin. In August 2016, a neighbor thought mother was hitting M.T. because he cried every time he showered.[3]

Mother denied substance use or mental health issues. Mother admitted she was in rehab in 2004 for narcotics use but said she had not used drugs since then. She agreed to drug test. Mother stated she smokes cigarettes outside and occasionally drinks at parties. She had not drunk alcohol that year, however, because she was on medication following back surgery in December 2019. Mother had applied for disability. She had been receiving benefits, but they were canceled. Mother described her financial status as her biggest stressor.

At the time, M.T. was in sixth grade. He has asthma and in 2014 was diagnosed with ADHD. M.T. was up to date with his medical care. His July 2020 well-child visit was normal.

The social worker interviewed M.T. privately. He said he forgot to cover some tools, and the next morning "they took his phone away." He "got mad," packed his things, and went to

---

[3] The Department deemed the allegation inconclusive. The Department also received a referral in November 2012 alleging general neglect based on mother's then-girlfriend's care of M.T. and mother's older child. It concluded the allegations were unfounded.

the neighbor's house. He did not return right away because he thought he'd "get in trouble" and his electronics would be taken away. M.T. said mother yells at him if he "does not do something." He said mother does not hit him and denied ever being hit with a broom or for holding something the wrong way. M.T. recalled mother hit him once "a long time ago." He confirmed mother usually takes away his electronics to discipline him. M.T. had no visible marks or bruises.

The social worker also spoke with E.N., mother's partner/girlfriend[4] of seven years. She does not live in the home. E.N. confirmed mother's version of events: she took M.T.'s phone after he did not take out the trash and locked the front door when M.T. said he was going to leave. E.N. said mother did not kick M.T. out of the house and she denied physical discipline.

Maternal grandmother arrived while the social worker was at mother's home. She said the entire family had been looking for M.T. and, when he came home, he said he had left because his phone had been taken. M.T. sometimes spends the weekend with maternal grandmother at her house. Maternal grandmother had no concerns about mother caring for M.T. She said mother drinks occasionally at parties but has not had alcohol since her December 2019 surgery.

E.N.'s drug test came back negative, but the results for mother's September 22, 2020 drug test were positive for amphetamine/methamphetamine. Mother denied using drugs. She believed her prescription medications may have triggered

---

[4]     The record refers to E.N. as mother's "partner" and "girlfriend" interchangeably.

the positive test, but the toxicology lab told the social worker mother's medications would not cause a positive test for those substances.

On October 19, 2020, there was a fire in mother's home. M.T. saw smoke coming from mother's room. Flames came out when mother opened the door, and M.T. ran outside. He fell, but was not hurt. The fire incident report stated the fire appeared unintentional, caused by a candle igniting paper.

M.T. was detained from mother's care on October 21, 2020, and placed with maternal aunt. Maternal grandmother was there when M.T. was removed. She said she was concerned because M.T. had become aggressive with mother—he pushed her to the ground and slammed the door.

When M.T. arrived at maternal aunt's, the social worker spoke with him privately. He was sad he wasn't with mother. He said he felt safe with mother and with maternal aunt. M.T. denied pushing mother; he said she accidentally fell while he was helping her put things away. He told the social worker he slammed the door because he was angry; mother had told him to hurry up, grabbed a belt, and began counting down from three. He said mother did not hit him with the belt; she just threatened him.

On October 25, 2020, the Department filed a juvenile dependency petition on behalf of M.T. under section 300, subdivision (a)—alleging mother physically abused M.T. with a belt—and under section 300, subdivision (b)—alleging mother's history of and current substance abuse and physical abuse of M.T. placed him at risk of serious physical harm. At the October 28, 2020 detention hearing, the juvenile court detained

M.T. from mother, ordered conjoint counseling, and ordered monitored visitation for mother.

2. ***Jurisdiction report***

The Department reported the results of its further investigation into the petition's allegations in its November 20, 2020 jurisdiction report. M.T. continued to be placed with maternal aunt. During the day, while maternal aunt was at work, M.T. stayed with his adult brother (brother), who shares a home with maternal grandmother and maternal uncle. The Department interviewed M.T., mother, and others in November.

A social worker met with M.T. at maternal aunt's home. When asked about discipline, M.T. said, " 'When I would do something big, I get hit.' " He also said his privileges, such as his phone and video games, are taken away and he is grounded. M.T. said mother had hit him more than four times with a belt, shoe, or broom, but the last time was when he was seven or eight years old. On that occasion, mother hit him with a belt on his thigh and arm because he had taken his neighbor's cell phone and hid it. When he was about nine years old, mother threw a shoe at his knee when she became upset that he couldn't find her shoe. M.T. said mother always hit him hard.

Another time, while maternal grandmother was visiting, mother became upset when M.T. did not follow directions and hit him hard with a broom over his clothes on his buttocks. M.T. also recalled a time when the family lived "at 'the old house,' " he accidentally opened the car door while mother was driving. Mother became upset and M.T. went inside the house and hid behind brother, whom mother hit as she was trying to hit M.T. M.T. said mother hit him with a belt on his thigh even though brother told her not to hit M.T.

M.T. described mother hitting him with a belt on his arms, thighs, and back when he was about six years old after he took money from E.N.'s father and hid it. And, when he was four years old, mother took him inside and hit him repeatedly with a belt after he had climbed up on a truck. He said, " 'I usually grab a pillow to cover myself when my mom hits me.' "

M.T. also relayed that, about a year ago, he told maternal uncle that mother had hit him when the uncle noticed a bruise on M.T.'s arm. According to M.T., maternal uncle spoke to mother about hitting M.T. then and again about a week before M.T. was detained. At another unspecified time, brother also told mother not to hit M.T. after he saw lumps on M.T.'s arms and legs. Although mother said she wouldn't hit M.T. anymore, M.T. stated mother would always hit him again one or two weeks later. M.T. said maternal grandmother also had seen his bruises.

M.T. told the social worker he was "afraid of his mother because he did not know how she would react or what she would do to him." He said, " 'sometimes she gets mad at me for no reason.' " M.T. told the social worker he did not share these incidents during his first interview because he was scared after law enforcement interviewed him.

The social worker also asked M.T. about mother's substance use and behavior. M.T. denied having ever seen drugs or drug paraphernalia in his home or mother's possession. He said mother used to drink beer before she became disabled. At home she would have two beers while doing a puzzle; she was not aggressive or violent when drinking. Twice, about a year earlier, mother got drunk at a party and M.T. called maternal grandmother and brother to drive them home. Mother threw up

in the back seat.  M.T. also reported mother's doctors told her not to smoke cigarettes, but she continued to smoke due to stress and because M.T. is a " 'trouble maker.' "

M.T. also told the social worker mother sometimes cries and won't talk to anyone—usually after an argument with her partner.  He said mother sometimes sleeps during the day because she stays up until 2:00 to 3:00 a.m. and " 'never sleeps.' " On a few occasions in 2019, he saw mother closing her eyes while driving, and he had to " 'touch her and touch her' " to keep her from falling asleep.  When asked, M.T. said he wished mother would " 'stop getting mad at [him]' " and not cry so much.  M.T. revealed he is worried mother might kill herself because she has said "she does not want to wake up at all sometimes."

The social worker spoke with mother by phone and in person.  Mother did not understand why M.T. had been detained from her care.  She told the social worker she started using cocaine every other weekend when she was 18 and stopped using in 2003 (at about 23 years old).  When she was about 21 years old, she started using methamphetamine "only when she was with friends."  Mother said, " 'I did not use often and was not an addict because it wasn't satisfying for me to forget things.' " Mother enrolled herself in rehab in 2004.  She stated, " 'I don't consider myself a user like them users I've seen,' " meaning " 'the bums around [her] house.' "

Mother also could not understand why her drug test was positive.  She insisted the last time she used drugs was in 2004. Despite her doctor's assurances, mother was concerned her prescribed pain medication caused her drug test to be positive for methamphetamine, so she stopped taking them.  As a result, mother was in a lot of pain.  She also told the social worker she

9

had participated in counseling for two months in 2019. She stopped counseling when she had her surgery and because her past trauma was brought up. (Mother was sexually abused as a child by her stepfather.) Mother had been diagnosed with depression three to four years earlier and prescribed antidepressants. She also stopped taking her antidepressants due to the dependency case. She said her doctor told her antidepressants can show a false positive on a drug test.

In response to the petition's physical abuse allegations, mother said she hit M.T. with a belt over his clothes on the buttocks once when he was eight or nine years old. M.T. had taken an iPhone from the neighbor and lied about it. Mother said that was the only time she hit M.T. with a belt. Mother stated she " 'would only verbally threaten to hit him and tell him [I'm going to hit you] but never hit him.' " She continued, " 'I can't even move[;] how could I be hitting him every time[?]' " Mother has been unable to work since her back surgery in December 2019. She has limited mobility; she could not walk on her own until about three or four months earlier.

The social worker met privately with brother. He regularly visited mother and M.T. at their home once or twice every two weeks. Occasionally, mother would be drinking a 24-ounce beer, but she did not appear inebriated. He also denied mother ever appeared under the influence of drugs. He confirmed that he once had to pick up mother and M.T. at a party at E.N.'s home because mother was intoxicated. He said it was an isolated incident, and he had heard of no other instances when mother was intoxicated while supervising M.T.

Brother denied having ever seen bruises or marks on M.T. or mother having used corporal punishment. He was aware of

the incident when mother hit M.T. with a belt for stealing a cell phone, but said " 'it was years ago.' " He believed the incident occurred shortly after he moved out of the home around 2017. He told the social worker that mother called him a few times about M.T.'s behavior and said she "felt like she wanted to hit" M.T. Brother said he'd tell mother not to hit M.T.; he then would go to the house and talk to M.T. about his behavior.

Brother monitored mother's visits on his days off work. He reported mother did not appear to be under the influence of any substances, was appropriate during visits, and sends food to the caregiver's home. He had no concerns about M.T. returning to mother's care.

The social worker also met with maternal uncle individually. Maternal uncle visited mother and M.T. about once every two months. M.T. had told him that he gets into trouble at home. Maternal uncle, however, denied that M.T. had told him mother physically disciplined him and denied having seen any marks or bruises on M.T. He also had no safety concerns about M.T. with mother.

He too believed mother's positive drug test resulted from her taking prescribed medication. He denied having ever observed mother to be under the influence of any substances.[5] Maternal uncle confirmed mother is in pain and having difficulty walking. He worried about M.T. acting out and not listening to mother—he didn't want mother to have "extra stress" with her medical condition.

---

[5] When he was a teenager, mother told him to be safe if he were to use drugs and take them only with people he trusted.

11

Maternal grandmother, whom the social worker interviewed telephonically, also denied having observed, or believing, mother to be under the influence of drugs. She also thought mother's positive drug test was due to her medications. After mother's back surgery, maternal grandmother stayed with mother from December 2019 until April 2020 and has since visited about twice a week. Mother told her she can't sleep at night.

Maternal grandmother said she had seen mother drink a few beers. She described mother as drinking " 'every once in a while' at family gatherings." She denied having been called to pick up mother and M.T.

Maternal grandmother also denied having seen any marks or bruises on M.T. or that he ever told her mother physically disciplined him. She said mother does not use physical discipline; she only takes privileges away from M.T.

In her telephonic interview with the social worker, mother's girlfriend E.N. also stated her belief that mother's positive drug test was due to her medications. E.N. regularly visited mother on the weekends and occasionally during the week for a few hours. They have known each other for 20 years. She denied mother used drugs. She said mother drinks at social gatherings, but not to the point of inebriation.

E.N. believed M.T. was safe in mother's care. She stated she would have done something if she was concerned. E.N. is a mother herself, loves M.T., and "would do anything to help him." She never witnessed nor had any knowledge about mother allegedly physically disciplining M.T. She denied M.T. ever told her mother had hit him or having seen any marks or

12

bruises on him.  M.T. told E.N. that mother was mad at him and screamed at him.

The social worker also spoke to mother's landlord by telephone.  Mother and M.T. have lived at the property for five to six years.  The landlord said she has heard mother yelling at M.T., but noted mother "speaks in a loud tone."  In the past, M.T. told the landlord that mother hit him with her hand; she assumed mother spanked M.T. on the buttocks.  The landlord denied having observed any bruises on M.T. and has never seen mother physically discipline M.T.

Nor had the landlord ever observed or suspected mother of using drugs.  She said mother occasionally has had family gatherings where the family will drink, but mother did not appear inebriated.  The landlord had no safety concerns for M.T. in mother's care.  She believed mother yells at him because he misbehaves and ignores mother.

Mother enrolled M.T. in therapy on October 9, 2020. The sessions were conducted weekly over video call due to the pandemic.  The therapist told the social worker that M.T. had not reported being fearful of mother—he missed her and wanted to return to her care.  M.T. also expressed concern for mother's well-being.  The therapist had no concerns about M.T.'s safety at that time.

On November 9, 2020, mother enrolled in a 12-week parenting class and a 12-week anger management course. She also scheduled an intake appointment for individual therapy on December 15, 2020.

Mother was a no show for drug testing on November 5, 2020.  Mother's drug test on November 12, 2020 again was

positive for methamphetamine. Her November 17, 2020 test, however, was negative for all substances.

### 3. *Jurisdiction/Disposition*

The juvenile court convened a combined jurisdiction/ disposition hearing on December 3, 2020. Along with the Department's reports, the court received into evidence a December 2, 2020 progress letter stating mother had completed three of twelve sessions in separate parenting and anger management classes. Mother had maintained good attendance and active participation in both programs.

Mother's counsel argued the petition should be dismissed. She confirmed mother admitted to hitting M.T. when he took an iPhone, but argued it was several years earlier. Counsel noted no other relatives had reported seeing any marks or bruises on M.T. or having concerns about physical abuse—only M.T. had reported having bruising. Counsel argued there thus was insufficient evidence to sustain the physical abuse allegation. Counsel also argued the evidence was insufficient to sustain the allegations of substance abuse and there was no nexus between the alleged abuse and harm to M.T. Counsel noted that, although mother had two positive drug tests, her most recent drug test was negative. Mother was adamant she had not used methamphetamine in 15 years and no one else interviewed had observed mother to be under the influence.

M.T.'s counsel and the Department asked for the petition to be sustained. The Department asked the court to remove M.T. from mother due to her unresolved issues. Counsel noted mother was testing, but had not enrolled in a substance abuse program.

14

The court sustained the petition under section 300, subdivision (b)(1) (section 300(b)(1)).[6] The court sustained the b-2 count of physical abuse as alleged, but noted M.T.'s statements were inconsistent as to when mother hit him last.[7] The court sustained the b-1 substance abuse allegation as alleged, noting mother continued to test positive despite denying she used methamphetamine. In finding M.T. was at risk of harm, the court considered his age, the effects of secondhand smoke, and mother's apparent "anger and frustration issues that she [was] taking out on her son, which could be a result of her substance use." The court also noted mother lacked insight and continued to have parenting challenges that may be exacerbated by being under the influence. The court had concerns M.T. would mimic mother's behaviors, increasing the likelihood that he would use drugs at an early age.

---

[6] Section 300(b)(1) requires the Department to show the child has suffered or is at substantial risk of suffering serious physical harm or illness because of the parent's inability to protect or supervise the child.

[7] The court dismissed the physical abuse allegations under subdivision (a). As the Department notes, the reporter's transcript states the court said it would "sustain the A-1" count, but then states it was "unclear" if the physical abuse was "an A." The minute order states, "Count A1 is dismissed." Counts a-1 and b-2 were based on the same physical abuse allegations. (Section 300, subdivision (a) requires the Department to show the child has suffered or is at substantial risk of suffering "serious physical harm inflicted nonaccidentally upon the child by the child's parent.")

15

The court declared M.T. a dependent, removed him from mother, and ordered mother to have monitored visitation. The court ordered the Department to provide reunification services and for mother to participate in a full substance abuse program with random testing, a 12-step program, parenting and individual counseling, conjoint counseling with M.T. if his therapist recommended it, and a psychological assessment.

Mother filed a timely notice of appeal.

4.    *Post-appeal developments*

On June 17, 2021, while this appeal was pending, the juvenile court terminated its earlier removal order and returned M.T. to mother's custody under the continued jurisdiction of the juvenile court. On July 2, 2021, we granted mother's request that we take judicial notice of that order. In supplemental letter briefing, the Department argued mother's challenge to the court's removal of M.T. is now moot. Mother does not oppose the dismissal of her appeal as to the dispositional order.

We agree mother's challenge to the dispositional order is moot and do not consider it. As M.T. has been returned to her custody, there is no further relief we can provide mother, even if we were to find the court erred in removing M.T. (See *In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.)

## DISCUSSION

We consider only mother's contention that substantial evidence does not support the juvenile court's findings that M.T. was a child described by section 300(b)(1). Because we conclude substantial evidence supports finding M.T. was at substantial risk of harm due to mother's substance abuse (count b-1), we need not consider whether the evidence of mother's past physical abuse (count b-2) also provided a sufficient basis to support

16

dependency jurisdiction over M.T.  (See *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

## 1.   *Standard of review and applicable law*

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. . . .  "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.  [Citations.]  ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' " ' "  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  Substantial evidence is " 'evidence which is reasonable, credible, and of solid value.' "  (*In re I.C.* (2018) 4 Cal.5th 869, 892.)

Section 300(b)(1) authorizes dependency jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse."

To support a jurisdictional finding under section 300(b)(1), the Department must prove "three elements by a preponderance

17

of the evidence:  (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness."  (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)  Section 300(b)(1) " 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).' "  (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)  Nevertheless, "the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation].  The court may consider past events in deciding whether a child presently needs the court's protection.  [Citation.]  A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' "  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215–1216.)

"The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child."  (§ 300.2.)  Nevertheless, a parent's substance abuse, "without more," generally is an insufficient basis to assert dependency jurisdiction.  (*In re L.W.*, *supra*, 32 Cal.App.5th at p. 849.)  Rather, the Department must show the parent's substance abuse harms the child or places the child at substantial risk of harm.  (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766–767; see *L.W.*, at p. 850 [mother engaged in dangerous behavior due to substance abuse placing child at risk of harm].)

## 2. *Substantial evidence supports the finding that M.T. was at a current risk of serious physical harm due to mother's current substance abuse*

Mother argues the evidence, despite her positive tests for methamphetamine use, does not support the court's finding that she is a substance abuser or that any substance use affected her ability to care for M.T. As mother asserts, she had no criminal history nor a clinical substance abuse diagnosis at the time of the jurisdictional hearing.[8] Nevertheless, mother tested positive for amphetamine/methamphetamine on September 22, 2020, and methamphetamine on November 12, 2020, with a no show on November 5, 2020. Moreover, mother insisted the positive tests were the result of her taking prescription medication, even though she admitted her doctor told her that the medications would not trigger a false positive for methamphetamine. Mother later claimed her doctor said her antidepressants could result in a false positive. But, mother had given the social worker her list of prescribed medications—including her antidepressants— and the toxicology lab confirmed the positive methamphetamine result could not be attributed to mother's medications. We can infer the court found the toxicology lab's confirmation credible.

---

[8] Citing *In re Christopher R., supra*, 225 Cal.App.4th at p. 1218, fn. 6, for the court's discussion of the criteria indicating a substance use disorder stated in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), mother apparently contends there was no evidence she satisfied any of those criteria. Mother may not have been diagnosed with a substance abuse disorder, but mother previously was involved in drug treatment, denied using drugs in the face of two positive tests, and minimized her prior use

Mother also admitted a history of drug use. She had used both cocaine and methamphetamine regularly and enrolled herself into a drug rehabilitation program in 2004. Mother nevertheless did not believe she was an addict. She told the social worker she didn't consider herself " 'a user like them users' " she'd seen, referring to homeless people who lived behind her home and stayed up all night going through the trash. Although mother had gone to rehab more than 15 years earlier, the juvenile court reasonably could find mother's history of drug use, along with her positive drug tests, continued denial of current drug use, and minimization of her past drug use, demonstrated she had a substance abuse problem.

Noting her " 'mere usage of drugs' " is insufficient to support a jurisdictional finding under section 300(b)(1), mother

of drugs, all of which are indicative of a current substance use problem. (See *In re K.B.* (2021) 59 Cal.App.5th 593, 601–602 [finding of substance abuse warranted by evidence mother initially denied drug use despite positive test, changed her story about when she used drugs, denied past drug use despite prior arrest, fell asleep daily at 5:00 p.m., and failed to enroll in substance abuse program]; *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 725–726 (*Rebecca C.*) [finding earlier Court of Appeal decisions did not require a medical diagnosis as an element of proof to find substance abuse under section 300].) And, as we discuss, there was evidence from which the court reasonably could infer mother's drug use negatively affected both mother and M.T. (Cf. *Rebecca C.*, at p. 726 [record will not support finding parent has a substance abuse problem justifying intervention of the juvenile court where there is a lack of medical diagnosis of substance abuse *and* a "lack of evidence of life-impacting effects of drug use"].)

asserts the evidence does not show any recent drug use affected her ability to care for M.T. or placed him at substantial risk of harm. (*Rebecca C., supra*, 228 Cal.App.4th at p. 727 [" 'mere usage of drugs is not a basis for the assertion of dependency [court] jurisdiction' "].) She asserts none of the witnesses the Department interviewed had concerns about M.T.'s safety in mother's care or reported having suspected mother of drug use or having seen her under the influence while caring for M.T. M.T. said he knew what drugs were, but denied having seen any drugs or drug paraphernalia at the home or in mother's possession. The Department observed mother's home to be tidy, stocked with sufficient food, and having no safety hazards. Mother ensured M.T. regularly attended school and went to his medical appointments, and she continued to cook for him during visits after his detention.

While this evidence supports mother, the record also includes sufficient evidence to support the finding that mother's substance use negatively affected her ability to care for M.T. and placed him at risk of substantial harm. As the Department stated in its jurisdiction report, "[i]t is evident that . . . mother has used methamphetamine while [M.T.] was in her care." Mother tested positive for methamphetamine in September 2020. At that time—although E.N. and maternal grandmother regularly visited—mother and M.T. lived in the home alone. The juvenile court, therefore, could reasonably infer mother was under the influence of drugs while responsible for M.T.'s care and supervision.

The Department was "gravely concerned" about mother's continued denial of methamphetamine use in the face of two positive drug tests. It viewed mother as "self-medicating" to deal

with her unresolved childhood trauma and depression diagnosis. And, although she enrolled in parenting and anger management classes, mother had not enrolled in a drug treatment program. The investigating social worker "encouraged" mother to participate in Narcotics Anonymous meetings, but mother merely said she "had no interest in using any drugs." Yet, her drug test two days later was positive for methamphetamine. The juvenile court could infer from mother's repeated denial of substance use —and minimization of her past drug use—that she lacked insight into her problem and would not cease her drug use while caring for her at times challenging preteen, without court intervention. (See *In re A.F.* (2016) 3 Cal.App.5th 283, 293 [" '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' "].)

Moreover, as the Department noted, "[m]ethamphetamine is an inherently dangerous drug, which is known to cause visual and auditory hallucinations, sleep deprivation, intense anger, volatile mood swings, agitation, paranoia, impulsivity, and depression." (See *In re Alexzander C.* (2017) 18 Cal.App.5th 438, 449, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) The record demonstrates mother suffered from some of these symptoms. According to M.T., at times, mother "would cry all the time and would not talk to anyone," she stayed up until two or three a.m. and " 'never sle[pt].' " When M.T. asked mother why she couldn't sleep, mother told him, " 'It's none of your business.' " She also frequently told M.T. she was tired and to not "bother her." M.T. was afraid of mother "because he did not know how she would react or what she would do to him." He said, " 'sometimes she gets mad at me for no reason.' "

Moreover, M.T. described mother as sleeping during the day and falling asleep when driving with M.T. in the car—establishing mother not only did not properly supervise him,[9] but also placed him at risk of substantial harm. Mother's past behavior also demonstrated that, when under the influence, mother made poor choices endangering M.T. Despite being inebriated to the point of getting sick, mother wanted to drive M.T. home. It was M.T.—just 10 years old—who acted as the responsible adult and called brother to drive them home. Mother also did not follow her doctors' advice or seem to consider M.T.'s asthma when she continued to smoke cigarettes[10] due to stress and because M.T. was a " 'trouble maker.' "

As the court noted, mother continued to struggle in parenting M.T. and showed signs of anger and frustration. Mother contends the court merely speculated that substance abuse could be exacerbating these issues. We disagree. Mother admitted she hit M.T. with a belt several years earlier when he took an iPhone, but insisted she no longer used corporal punishment, noting she was physically unable to hit him due to her immobility. Yet, mother admitted she "verbally threaten[ed]" to hit M.T. with a belt. M.T. confirmed this shortly after his detention when he recounted what appears to have been a

_____

[9]    The morning M.T. left the house after E.N. took his phone, mother also was asleep. E.N. had to wake mother up to tell her M.T. was missing.

[10]    At the jurisdictional hearing, the court mentioned the effects of "secondhand smoke." We presume the court was referring to mother's cigarette smoking.

23

recent incident.  He described mother as having grabbed a belt and counted down from three while telling him to "hurry up."

We presume the trial court found M.T.'s statements credible that mother hit him with a belt and broom in the past and threw a shoe at him when he couldn't find *mother's* shoe. Mother's past conduct along with her current use of a belt to threaten M.T. support a reasonable inference that, if mother were under the influence when M.T. acted out again, she easily could lose control, and make good on her threat to hit him.  As maternal uncle said, M.T.'s behavior was putting extra stress on mother.  Nor was it speculative for the court to infer mother's anger and frustration with M.T. could be exacerbated by substance abuse considering mother's erratic behaviors M.T. described.

Accordingly, contrary to mother's contention, the record shows there was more than " 'mere usage' " of drugs here to support the juvenile court's exercise of its jurisdiction under section 300(b)(1) over M.T.

## DISPOSITION

The juvenile court's December 3, 2020 jurisdictional order is affirmed.  Mother's challenge to the dispositional order is dismissed as moot.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.